# United States Court of Appeals
## For the First Circuit

Nos. 02-1329
    02-1475

IN RE PROVIDENCE JOURNAL COMPANY, INC.,

Petitioner.

ON PETITIONS FOR WRITS OF MANDAMUS
TO THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Boudin, Chief Judge,
Selya and Lipez, Circuit Judges.

Howard A. Merten, with whom Gordon P. Cleary and Vetter &
White, Inc. were on brief, for petitioner.
Jerry Elmer and Goldenberg & Muri LLP on brief for Rhode
Island Affiliate — American Civil Liberties Union, amicus curiae.
Lucy A. Dalglish on brief for The Reporters Committee for
Freedom of the Press, American Society of Newspaper Editors, The
Society of Professional Journalists, Radio-Television News
Directors Association, and Newspaper Association of America, amici
curiae.
William L. Patton, with whom Joan McPhee, Michele T. Perillo,
and Ropes & Gray were on brief, for respondent (Hon. Ernest C.
Torres).

June 12, 2002

**SELYA**, <u>Circuit Judge</u>.  This proceeding is an outgrowth of the widely publicized political corruption case brought by the federal government against Providence mayor Vincent A. ("Buddy") Cianci, Jr., and several codefendants.  During the trial, a daily newspaper filed serial mandamus petitions seeking to remediate perceived violations of First Amendment and common-law rights of access to documents, videotapes, and other materials that comprise part of the court record.  These petitions present, in essence, three important questions (some of novel impression).

The first question pertains to public access to memoranda of law that counsel are required by local rule to submit in connection with motions.  These memoranda contain the substance of a movant's argument or a nonmovant's opposition:  pertinent facts, case law, statutory references, and legal reasoning.  As to this question, we conclude that the District of Rhode Island's longstanding practice of refusing to place these memoranda in the case file, available for public perusal, violates the First Amendment.  The second question pertains to the manner in which the district court has handled such memoranda in the Cianci case.  We uphold most — though not all — aspects of the praxis employed by the district court.  The third question involves the newspaper's request for copies of videotape and audiotape evidence introduced at the trial.  Given the circumstances, we conclude that the

-2-

district court's refusal to accede to this request did not constitute an abuse of discretion.

## I.  BACKGROUND

Although the two petitions share a common nucleus of operative fact, they constitute discrete requests for relief. Accordingly, we describe each petition separately.

### A.  <u>The First Petition</u>.

On April 2, 2001, a federal grand jury indicted Mayor Cianci, along with five other individuals, on a variety of charges. The linchpin of the indictment was a RICO conspiracy count that, in effect, charged the defendants with operating City Hall as a racketeering enterprise that demanded bribes, sometimes thinly disguised as "campaign contributions," as a prerequisite to doing business with the municipality and its agencies. The indictment itself came as no surprise:  some details of the federal probe, dubbed "Operation Plunder Dome," had surfaced earlier, and a number of other persons already had been indicted on related charges.

Both before and after the Cianci indictment, Operation Plunder Dome received pervasive publicity. During the grand jury investigation that culminated in this indictment, leaked information proved to be a persistent problem.  To cite one example, a local television station broadcast a videotape that had been presented to the grand jury as evidence.  To cite another, an

Assistant United States Attorney (AUSA) played an FBI surveillance tape for several of his friends.

The Cianci indictment brought heightened attention to the scandal. Determined to ensure the protagonists' right to a fair trial, the district court sanctioned the wayward AUSA, appointed a special prosecutor to investigate whether criminal contempt charges should be brought against whomever was responsible for the grand jury leaks, and reminded counsel of their obligation to refrain from publicly disseminating information that threatened the integrity of the upcoming trial. See D.R.I. R. 39 (precluding release of information if there exists a "reasonable likelihood that it imposes a serious and imminent threat of interference with a trial or action"); R.I. R. Prof'l Conduct, R. 3.6 (precluding extrajudicial statements that have a "substantial likelihood of materially prejudicing an adjudicative proceeding").

The capstone of the court's efforts was the issuance, on May 15, 2001, of a non-dissemination order. Citing the "intense media coverage" surrounding the Cianci case, the court foresaw "a substantial risk of prejudicing the parties' right to a fair trial." To diminish that risk, the court prohibited the dissemination of, inter alia, any information regarding the testimony, character, credibility, or reputation of any witness; any information presented to the grand jury; and any information concerning plea negotiations. The order (which contained an

exception for information "presented at trial or during the course of any hearing conducted in open court") was to remain in effect pending the disposition of all charges against all defendants.

In the same order, the court instituted a procedure with respect to the filing of any documents that might contain references to restricted information. Each such document was to be filed under seal, accompanied by a separate descriptive document that, inter alia, stated the reasons why the submitted document should be sealed. The court, acting sua sponte or on the motion of any party, could order any document to be unsealed if it determined that, notwithstanding any references to restricted information, insufficient justification existed for keeping that document confidential.

On May 23, 2001, the district court issued an order amending this procedure (we henceforth refer to the May 15 order, as modified by the May 23 order, as the non-dissemination order). The May 23 order changed the ground rules in three respects. First, counsel were instructed to refrain from making any reference to restricted information in motions or oppositions to motions. Second, the author of any legal memorandum submitted in connection with a motion was directed to file a certification as to whether the memorandum contained information subject to the non-dissemination order. Third, the order stated that if the court's subsequent review of any particular legal memorandum revealed that

the memorandum contained no restricted information, it would be placed on file in the clerk's office and made available for public inspection. The order made clear, however, that the court would not undertake to "redact or edit any memorandum."

The district court's treatment of legal memoranda in the Cianci case represented a departure from the prevailing practice in the District of Rhode Island. Although the court's local rules seem to provide for the filing in the clerk's office of legal memoranda supporting or opposing motions, see D.R.I. R. 12(a)(1)-(2), the District of Rhode Island has a longstanding practice — dating back to the early 1980s — of docketing such memoranda but not placing them in the case files maintained by the clerk's office. Instead, they are transmitted directly to the judge to whom the case is assigned and kept in the judge's chambers (inaccessible to public scrutiny except upon request). We discuss the propriety of this practice infra.

The Cianci case generated a blizzard of paper, and numerous documents were submitted to the court in accordance with the procedures established by the non-dissemination order. The state's major newspaper, THE PROVIDENCE JOURNAL (THE JOURNAL), chafed under this regime. On February 19, 2002, THE JOURNAL filed a motion seeking access to 42 previously filed memoranda that it claimed had

not yet been made public.[1]  In the same motion, THE JOURNAL sought

further modifications of the non-dissemination order, asserting

that the district court's general practice of denying access to

legal memoranda reversed the presumption of openness applicable to

judicial records.  THE JOURNAL implored the court to deem all such

memoranda public when filed unless, in a particular instance, a

motion to seal was docketed and the court, after individualized

inquiry, made specific record findings justifying confidentiality.

THE JOURNAL also asked the court to consider redaction on a document-

by-document basis as a less restrictive means of balancing the need

for confidentiality against the public's right to know.[2]

        Shortly before the start of trial, the district court

denied virtually all of THE JOURNAL's requests.  See United States

v. Cianci, Crim. No. 00-083-T, slip op. at 14 (D.R.I. Mar. 15,

2002) (unpublished) [hereinafter "D. Ct. Op."].  After outlining

---

[1]This was not THE JOURNAL's first expression of dissatisfaction
with the district court's handling of access to documents in the
Cianci case.  THE JOURNAL earlier had sought access to an FBI agent's
affidavit submitted in support of a request for a search warrant.
Based upon its determination that public disclosure of the
affidavit's contents prior to trial would prejudice the defendants'
Sixth Amendment rights, the district court denied THE JOURNAL's
motion.  United States v. Cianci, 175 F. Supp. 2d 194, 198, 205
(D.R.I. 2001).

[2]Although the non-dissemination order applied to more than
legal memoranda (e.g., it imposed stringent restrictions on
extrajudicial statements by the parties and their counsel), THE
JOURNAL has only challenged the order insofar as it pertains to the
treatment of legal memoranda.  Consequently, we express no opinion
anent any other feature of the non-dissemination order.

the traditional treatment of legal memoranda in the District of Rhode Island, id. at 1-4, the court described the special procedures that it had instituted in the Cianci case and noted that 11 of the 42 memoranda at issue already had been placed on file in the clerk's office, id. at 4-5. Of the remaining 31 memoranda, 17 (related to discovery motions) had been referred to a magistrate judge; 3 dealt with mundane matters that the court believed were of no conceivable interest to THE JOURNAL; and the final 11 could not "properly be made part of the public record before trial" because they referred to "grand jury matters and/or matters, the dissemination of which would prejudice the parties' rights to a fair trial." Id. at 6-7.

The district court then denied most aspects of THE JOURNAL's request to modify the non-dissemination order. The court characterized its treatment of legal memoranda in the Cianci case as "perfectly consistent" with THE JOURNAL's proposal to make all legal memoranda public unless otherwise directed by the court. Id. at 9. It rejected the suggested reinstitution of formal motions to seal on the ground that the suggestion already had proven unworkable. Id. Relatedly, the court expressed its unwillingness to rely exclusively on counsel's representations in determining whether to place legal memoranda on file in the clerk's office. Id. at 11-12. The court reiterated that redaction was infeasible both because the forbidden matters were "almost invariably

dispersed throughout the memoranda and inextricably intertwined with the references to applicable legal authority," and because the mechanics of redaction would squander scarce judicial resources. Id. at 13. Finally, the court agreed to amend the non-dissemination order to furnish a specific, on-the-record finding in support of any subsequent decision to withhold a particular memorandum. Id. at 14.

Trial commenced on March 23, 2002. Two days later, THE JOURNAL filed a mandamus petition with this court seeking: (1) access to legal memoranda previously submitted in the Cianci case but not yet made public; (2) a directive requiring all future memoranda to be placed on file in the clerk's office on the date of submission; and (3) modification of the non-dissemination order to require redaction when feasible (as a less restrictive alternative to sealing).

**B. The Second Petition.**

The second mandamus petition centers on 71 videotapes and audiotapes of secretly recorded conversations with various bureaucrats (including some of the defendants). Putting this petition into perspective requires an understanding of how the parties presented these videotapes and audiotapes during the Cianci trial.

In preparation for trial, the government transferred the entire contents of the 71 tapes onto CD-ROMs. After loading the

-9-

CD-ROMs onto the hard drive of a laptop computer, the government employed a software program called Sanctions to excerpt conversations for playback. Using this technology, the government introduced selected passages from these conversations into evidence in the course of trial. As the excerpts were played on the government's laptop computer, they were simultaneously broadcast via the district court's state-of-the-art audiovisual system to monitors in both the courtroom and a remote viewing room (the overflow room). As a taped excerpt was played, a transcript was simultaneously scrolled across the bottom of the screen.

Before trial, the media sought copies of the videotape and audiotape evidence. Discussions ensued between representatives of the press and David DiMarzio, the clerk of court, regarding possible methods by which the tapes could be copied and distributed to the media after they had been introduced into evidence. The clerk initially suggested that the parties could be required to submit an extra copy of each tape and the associated transcript for delivery to the media at an appropriate time. The district court vetoed this suggestion. Next, the media representatives proposed that the clerk's office copy the exhibits for the media. The clerk rebuffed this proposal on the ground that copying might damage the original tapes. At that point, the negotiations stalled.

Shortly after the trial began, THE JOURNAL moved for access to copies of the videotape and audiotape evidence. The court held

a hearing that focused on the practicalities of complying with that request. THE JOURNAL argued that other courts, in other criminal trials, had provided copies of taped evidence to the media in one of three ways: (1) by requiring court staff to copy the tapes; (2) by requiring the parties to submit duplicates; or (3) by rerecording the tapes as they were being played to the jury in open court.

Ruling from the bench, the district court scotched all three options. The court rejected the first based on concerns expressed by the clerk. It rejected the second because it was unwilling to impose upon the parties the "significant undertaking" of creating and supplying extra copies of the taped evidence. It rejected the third option based upon the clerk's representation that there was no feasible way to rerecord the tapes as they were being played over the court's evidence presentation system. In a written addendum, the court delineated an additional reason for its decision:

> The recordings being presented are in the form of audio and video tapes that include not only the conversations that have been played for the jury; but, also, additional conversations that have not and may not be admitted into evidence. Moreover, the Court is informed that the same is true with respect to the CD ROM's being used by counsel. Thus, providing The Providence Journal with recordings of the conversations played for the jury would require both editing and duplication of the tapes being offered in order to create something that does not presently exist.

On April 26, 2002, THE JOURNAL filed its second petition for a writ of mandamus. This petition sought to require the district court to supply the press with copies of all videotape and audiotape evidence played to the jury during the Cianci trial on a contemporaneous basis. We consolidated THE JOURNAL's two mandamus petitions for hearing. The district judge, through counsel, filed an opposition to each petition. We heard oral argument while the Cianci trial was ongoing (the district court sent the Cianci case to the jury on June 12, 2002).

## II. APPELLATE JURISDICTION

There is a threshold question as to whether THE JOURNAL should be proceeding by appeal or by mandamus. Compare, e.g., United States v. Ladd (In re Associated Press), 162 F.3d 503, 507 (7th Cir. 1998) (appeal), with, e.g., Oregonian Publ'g Co. v. United States Dist. Ct., 920 F.2d 1462, 1464-65 (9th Cir. 1990) (mandamus). In the circumstances of this case, however, all roads lead to Rome.

Under the All Writs Act, 28 U.S.C. § 1651, "[a] federal court of appeals has the power to treat an attempted appeal from an unappealable (or possibly unappealable) order as a petition for a writ of mandamus." United States v. Horn, 29 F.3d 754, 769 (1st Cir. 1994). On this basis, we exercised mandamus jurisdiction in United States v. Hurley (In re Globe Newspaper Co.), 920 F.2d 88 (1st Cir. 1990). In that case, a newspaper sought access to

-12-

records relating to a criminal trial.  The district court rejected both the newspaper's demand for access and its motion to intervene.  Id. at 90.  The newspaper pursued an appeal and simultaneously petitioned for a writ of mandamus.  Id.  We declined to decide the jurisdictional question, but, rather, granted relief under the aegis of the All Writs Act and dismissed the appeal as moot.  Id.

The petitions now before us are of the same general character as the petition in In re Globe Newspaper Co.  Here, as there, the petitions pose important questions bearing upon the constitutional and common-law rights of public access to judicial records in criminal proceedings.  Here, as there, the petitions are consonant with the historic use of mandamus as a means to check ostensible judicial usurpations of power.  See In re Pearson, 990 F.2d 653, 656 (1st Cir. 1993).  Because we believe that the issues raised by THE JOURNAL are worthy candidates for mandamus review, we exercise our discretion to entertain both petitions under our mandamus jurisdiction.[3]

III.  **THE LEGAL LANDSCAPE**

We next discuss the case law concerning rights of access to judicial records.  We begin with first principles.

---

[3]Along with its mandamus petitions, THE JOURNAL prudently filed a protective appeal.  In view of our decision to exercise mandamus jurisdiction, we will follow the course charted in In re Globe Newspaper Co., 920 F.2d at 90, and enter a separate order dismissing that appeal as moot.

Courts long have recognized "that public monitoring of the judicial system fosters the important values of quality, honesty and respect for our legal system." Siedle v. Putnam Inv., Inc., 147 F.3d 7, 10 (1st Cir. 1998) (citation and internal quotation marks omitted). This recognition has given rise to a presumption that the public has a common-law right of access to judicial documents. Nixon v. Warner Communications, Inc., 435 U.S. 589, 597 (1978). This presumptive right of access attaches to those materials "which properly come before the court in the course of an adjudicatory proceeding and which are relevant to that adjudication." FTC v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 412-13 (1st Cir. 1987). It follows, then, that the common-law right of access extends to "materials on which a court relies in determining the litigants' substantive rights." Anderson v. Cryovac, Inc., 805 F.2d 1, 13 (1st Cir. 1986).

Apart from the prerogatives attendant to the common-law right of access to judicial records, the public and the press enjoy a constitutional right of access to criminal proceedings under the First and Fourteenth Amendments. Globe Newspaper Co. v. Super. Ct., 457 U.S. 596, 603-06 (1982); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 575-80 (1980) (plurality op.). The constitutional right of access is not limited to the actual trial itself, but also encompasses most pretrial proceedings. See Press-Enterprise Co. v. Super Ct., 478 U.S. 1, 11-13 (1986) (Press-

-14-

Enterprise II); In re Globe Newspaper Co., 729 F.2d 47, 52 (1st Cir. 1984); see also Anderson, 805 F.2d at 11 (collecting cases). We have held that this constitutional right — which serves to ensure a "full understanding" of criminal proceedings, thereby placing the populace in a position "to serve as an effective check on the system" — extends to documents and kindred materials submitted in connection with the prosecution and defense of criminal proceedings.[4] Globe Newspaper Co. v. Pokaski, 868 F.2d 497, 502 (1st Cir. 1989) (citation and internal quotation marks omitted).

Although the two rights of access are not coterminous, courts have employed much the same type of screen in evaluating their applicability to particular claims. See, e.g., United States v. Soussoudis (In re Wash. Post Co.), 807 F.2d 383, 390 (4th Cir. 1986). This overlap is understandable because the jurisprudence discussing the First Amendment right of access to criminal proceedings has been derived in large measure from the jurisprudence that has shaped the common-law right of access. See Anderson, 805 F.2d at 13.

---

[4]This holding comports with case law from our sister circuits. E.g., United States v. Biaggi (In re N.Y. Times), 828 F.2d 110, 114 (2d Cir. 1987); United States v. Soussoudis (In re Wash. Post Co.), 807 F.2d 383, 389-90 (4th Cir. 1986). We note, however, that the Supreme Court has not yet passed upon whether the constitutional right of access in criminal proceedings extends to judicial records.

## IV.  ANALYSIS:  THE FIRST PETITION

The first mandamus petition attacks both the District of Rhode Island's overall treatment of legal memoranda and the trial court's handling of those memoranda in the Cianci case.  We address these points separately.  First, however, we focus on the applicable standards of review.

### A.  **Standards of Review**.

Despite the common ancestry shared by the two rights of access, the standards of review referable to those rights differ. On the one hand, the denial of a claimed right of access under the common law engenders review for abuse of discretion.  Id. at 13. A district court can abuse its discretion by "ignoring a material factor that deserves significant weight, relying on an improper factor, or, even if it mulls only the proper mix of factors, by making a serious mistake in judgment."  Siedle, 147 F.3d at 10. Since "only the most compelling reasons can justify non-disclosure of judicial records" that come within the scope of the common-law right of access, Standard Fin. Mgmt., 830 F.2d at 410 (citation omitted), this review is more rigorous than garden-variety abuse of discretion review.

On the other hand, constitutional access claims engender de novo review.  In re State-Record Co., 917 F.2d 124, 127 (4th Cir. 1990).  In such cases, the presumption in favor of access can only be overcome "by an overriding interest based on findings that

-16-

closure is essential to preserve higher values and is narrowly tailored to serve that interest." Press-Enterprise Co. v. Super. Ct., 464 U.S. 501, 510 (1984) (Press-Enterprise I). This last requirement adds a new dimension and makes the First Amendment standard even more stringent than the common-law standard. Thus, courts have tended to employ the First Amendment standard in situations in which both rights of access are implicated. E.g., In re Wash. Post Co., 807 F.2d at 390.

Against this backdrop, we turn to the legal memoranda that parties are required to file in conjunction with motions submitted in the District of Rhode Island. The local rules specify that those memoranda must contain the critical elements of the parties' arguments. See D.R.I. R. 12(a)(1)-(2). It follows that those memoranda constitute materials on which a court is meant to rely in determining the parties' substantive rights. In a criminal case, therefore, they are subject to both common-law and First Amendment rights of access. Accordingly, we review the district court's treatment of them under the First Amendment's heightened standard of review.

### B. **The Traditional Practice**.

The respondent notes, correctly, that legal memoranda in the Cianci case have been made available to the public so long as they do not contain restricted information. Building on that foundation, he argues that the District of Rhode Island's

-17-

traditional method of treating memoranda is not properly before us. We do not agree.

The district court has made clear that its handling of legal memoranda in the Cianci case represents an ad hoc exception to the District of Rhode Island's standard practice. Absent mandamus review, the constitutional questions stemming from this standard practice — a practice that amounts to a blanket nonfiling policy — are likely to recur and to evade effective resolution. Moreover, an immediate adjudication of the matter will clarify matters for judges, litigants, lawyers, and journalists in a wide range of cases.

On suitable occasions, we have employed advisory mandamus to resolve issues "which are both novel and of great public importance." In re Recticel Foam Corp., 859 F.2d 1000, 1005 n.4 (1st Cir. 1988). The considerations enumerated above lead us to conclude that the blanket nonfiling policy is a suitable candidate for advisory mandamus. E.g., Schlagenhauf v. Holder, 379 U.S. 104, 109-12 (1964); Horn, 29 F.3d at 769-70.

Having concluded that we have an institutional interest in oversight of the District of Rhode Island's standard practice vis-à-vis the handling of legal memoranda, we turn to the validity of that practice. Motions and objections filed in the District of Rhode Island typically become part of the case file (and, thus, available for public inspection) at the moment they are filed in

-18-

the clerk's office. Legal memoranda submitted in conjunction with such motions are treated differently: those memoranda do not become part of the case file, but, rather, go directly to the judge to whom the case is assigned. This leaves the question of access solely in the discretion of the trial judge and places on persons desiring access the onus of initiating action. Whether viewed as a restriction on access or as a practical inconvenience, this protocol reverses the constitutional presumption of public access to documents submitted in conjunction with criminal proceedings. Cf. Pokaski, 868 F.2d at 507 (indicating that a statute that restricts public access to judicial records in criminal cases by "plac[ing] on the public the burden of overcoming inertia" is impermissible).

The respondent attempts to justify the blanket nonfiling policy on five bases. First, the legal memoranda are directed to the judge. Second, and relatedly, routing memoranda directly to the judge's chambers lessens the need for the judge to requisition the entire case file. Third, incorporating memoranda into the case files maintained in the clerk's office would "needlessly burden . . . already taxed storage facilities." Fourth, a blanket nonfiling policy serves to discourage overzealous counsel from attempting to gain an "unfair tactical advantage" by improperly influencing the public. Finally, memoranda submitted in connection with criminal proceedings might disclose grand jury testimony or

-19-

refer to other matters prejudicial to a defendant's right to a fair trial. None of these reasons justify the constitutional intrusion that results from the District of Rhode Island's standard practice of treating legal memoranda as presumptively nonpublic.

The respondent's first asserted justification proves too much. Although legal memoranda are directed to the judge, so are virtually all the other papers filed in the case (including motions and objections). The second asserted justification is no justification at all: requiring legal memoranda to be filed in the clerk's office would not mean that the judge would have to haul the entire case file into chambers whenever he or she wished to check a particular point. Copying is a routine exercise in most clerks' offices, and at any rate the district court's local rules require counsel to file memoranda in duplicate. See D.R.I. R. 12(d). That would permit placing one copy in the case file and routing the other directly to the judge.

Nor does the third asserted justification withstand scrutiny. While storage limitations may well have prompted the adoption of the blanket nonfiling policy two decades ago, the recently-completed renovation of the Federal Courthouse in Providence, coupled with the court's acquisition of the adjacent Pastore Building, have eliminated any intractable problem in that regard.

We are equally unpersuaded that the court's policy of keeping all legal memoranda hidden from public view is warranted based upon hypothetical concerns about overzealous counsel behaving badly. Judges deal every day with the need to ensure that lawyers play fair and square, and we are unwilling to assume, without hard evidence, that lawyers who practice in the District of Rhode Island are so unruly that ordinary antidotes to fractiousness (e.g., sanctions, contempt, loss of the right to practice) will prove impuissant.

As to the district court's fifth concern, we acknowledge that specific cases may pose greater risks of prejudicial disclosures (and, thus, may warrant special treatment). But there is no need to discard the baby with the bath water. Safeguards against prejudice can be implemented on a case-specific basis. Where a particularized need for restricting public access to legal memoranda exists, that need can be addressed by the tailoring of appropriate relief. As contrasted with the District of Rhode Island's existing practice of treating all legal memoranda as presumptively nonpublic, this would be a considerably less restrictive, but equally effective, means for dealing with the specter of potential prejudice. Cf. Pokaski, 868 F.2d at 506-07 (rejecting blanket sealing rule on ground that case-by-case evaluation of defendants' sealing requests represented a viable less restrictive means).

-21-

We hold, therefore, that the District of Rhode Island's blanket nonfiling policy — its standard practice of refusing to place memoranda submitted in conjunction with motions on file in the clerk's office when tendered — violates the First Amendment.[5]

### C. **The Procedure Employed Here**.

In the Cianci case, the trial court deviated from the District of Rhode Island's blanket nonfiling policy. Thus, its methodology invites a separate analysis.

The constitutional right of public access is a qualified right that may be outweighed by competing interests in a given case. Press-Enterprise I, 464 U.S. at 511 n.10; In re Globe Newspaper Co., 729 F.2d at 52. Certainly, in a case in which public attention is quite high, a court deliberating about whether to restrict broadly public access to materials submitted in connection with criminal proceedings ordinarily ought to afford interested parties an opportunity to be heard on the question of impoundment. See, e.g., United States v. Antar, 38 F.3d 1348, 1361 n.18 (3d Cir. 1994). The court would normally be expected to

---

[5]Although the Supreme Court has not established whether the constitutional right of access attaches to civil cases in general, the common-law right of access extends to judicial records in civil proceedings. Standard Fin. Mgmt., 830 F.2d at 408 & n.4. As said, that right encompasses legal memoranda. Because none of the respondent's rationales for rendering legal memoranda presumptively nonpublic rise to the level of a compelling reason sufficient to justify the nondisclosure of those documents, our invalidation of the District of Rhode Island's blanket nonfiling policy vis-à-vis legal memoranda applies in civil as well as criminal proceedings.

identify and balance the competing interests involved, and weigh reasonable alternatives to sealing, making findings where necessary. In re State-Record Co., 917 F.2d at 127-29; In re Wash. Post Co., 807 F.2d at 391.

Here, THE JOURNAL has not complained about a lack of notice, so we turn to the task of identifying and balancing the competing interests involved. The district court clearly registered its concern that the unrestrained disclosure of certain types of information about the Cianci case would create a substantial risk of prejudicing the parties' right to a fair trial. This disquietude impelled the court to implement, and then fine-tune, the non-dissemination order. An accused's Sixth Amendment right to a fair trial plainly rises to the level of a compelling interest. See Press-Enterprise I, 464 U.S. at 508. When that right collides head-on with the public's right of access to judicial records, the defendant's fair trial right takes precedence. In re Globe Newspaper Co., 729 F.2d at 53.

That does not mean, however, that the public's (and the media's) right to know can be frustrated by the mere invocation of a threat to the accused's Sixth Amendment right to a fair trial. A court faced with an impending collision between these rights must, on a case-specific basis, construct a balance. Press-Enterprise I, 464 U.S. at 510-11 & n.10. That weighing must proceed on the assumption that restrictions on access to

-23-

presumptively public judicial documents should be imposed only if a substantial likelihood exists that the accused's right to a fair trial will otherwise be prejudiced. Press-Enterprise II, 478 U.S. at 14. We caution that this inquiry requires specific findings; the First Amendment right of public access is too precious to be foreclosed by conclusory assertions or unsupported speculation. United States v. Kirk (In re Memphis Publ'g Co.), 887 F.2d 646, 648-49 (6th Cir. 1989); In re Wash. Post Co., 807 F.2d at 392-93 & n.9; United States v. Martin, 746 F.2d 964, 972 (3d Cir. 1984).

Political corruption cases tend to attract widespread media attention, and the Cianci case is a paradigmatic example. Here, moreover, the district court cited book and verse, cataloguing specific incidents that fueled its concerns that the defendants' ability to receive a fair trial was in danger of being substantively compromised by unrestrained disclosures. The court alluded specifically to leaks of information in violation of Rule 6(e) of the Federal Rules of Criminal Procedure and misbehavior by the lead prosecutor. In view of the notoriety of the case and the incidents recounted by the district court, we are convinced that the court's perception of a threat to the defendants' fair trial rights was objectively reasonable. See Gannett Co. v. DePasquale, 443 U.S. 368, 392-93 (1979) (concluding that the trial court properly appraised legitimate concerns that open proceeding posed

reasonable probability of prejudice to defendants' fair trial rights).

Having found that the defendants' fair trial rights represent a compelling interest, we next must decide whether the non-dissemination order is drawn as narrowly as practicable. The threshold question is whether a trial court, in a particular case, can adopt a procedure that reverses the presumption of public access and <u>automatically</u> seals all subsequent filings until the judge determines that a specific document poses no undue risk to the defendant's fair trial rights.

THE JOURNAL argues that the decision in <u>Associated Press</u> v. <u>United States Dist. Ct.</u>, 705 F.2d 1143 (9th Cir. 1983), requires that this question be answered in the negative. In that case, the district court, responding to extensive press coverage of a high-profile criminal matter, issued a sua sponte order directing the parties to submit all future filings under seal in order to permit the court "to initially review them and to make a determination with regard to disclosure." <u>Id.</u> at 1144. The trial court subsequently imposed a 48-hour time limit within which it would rule upon the need for a given filing to remain sealed. <u>Id.</u> at 1145. The Ninth Circuit nonetheless struck down the procedure and directed the district court to vacate its order. <u>Id.</u> at 1147.

In our view, <u>Associated Press</u> is a horse of a different hue. There, the court of appeals concluded that the trial court

had failed to make specific findings showing that "access to pretrial documents will create a substantial probability of irreparable damage to defendants' fair trial rights." Id. at 1146. The presence of such findings here readily distinguishes this case.

We find more helpful the opinion in United States v. McVeigh, 119 F.3d 806 (10th Cir. 1997). There, the court acknowledged that a high-profile criminal case may "impose[] unique demands on the trial court, and require[] the court to establish procedures for dealing effectively, efficiently and fairly with recurring issues such as whether documents should be placed under seal or redacted." Id. at 813. This is exactly what transpired here. In response to a cognizable threat to the defendants' Sixth Amendment rights, the district court adopted a practical procedure that enabled it effectively and efficiently to safeguard those rights. Nothing in the case law prevents a court from establishing this sort of prophylaxis. And given the circumstances of this case, the district court's implementation of a general procedure to seal all memoranda temporarily appears narrowly tailored.

Turning our attention to the specifics of the non-dissemination order, we hold that the district court's insistence on reviewing each memorandum before deciding whether it should remain under seal did not constitute reversible error. Although we question the court's apparent reluctance to rely on counsel to separate wheat from chaff in accordance with the non-dissemination

order — experience teaches that most lawyers will cooperate with the court and, in all events, will be loath to defy a court order — nothing precludes the district court from assuming that burden.

This does not mean that we regard the non-dissemination order as a textbook model. We have four specific concerns. First, where, as here, a court undertakes to screen documents before they are placed in the case file, the procedure should incorporate a specific timetable obligating the court to perform its self-imposed screening responsibilities promptly and to render a timely decision as to whether a particular document is fit for public disclosure. Second, and relatedly, the court below decided to refrain from reviewing each individual memorandum to decide whether it could be made available to the public until after the time had expired for the submission of any possible reply memorandum. This unnecessarily prolongs the process. Each individual memorandum either contains restricted information (in which case it is subject to redaction or sealing) or it does not (in which case it does not pose a threat to the defendants' Sixth Amendment rights). Third, the order contains no provision as to whether the court intends to unseal retained memoranda at some point after the trial has ended (and if so, when).

Finally, we think that the district court's refusal to consider redaction on a document-by-document basis is insupportable. Courts have an obligation to consider all

reasonable alternatives to foreclosing the constitutional right of access. In re Globe Newspaper Co., 729 F.2d at 56. Redaction constitutes a time-tested means of minimizing any intrusion on that right. See United States v. Amodeo, 44 F.3d 141, 147 (2d Cir. 1995) (stating "that it is proper for a district court, after weighing competing interests, to edit and redact a judicial document in order to allow access to appropriate portions of the document"); see also United States v. Biaggi (In re N.Y. Times), 828 F.2d 110, 116 (2d Cir. 1987) (rejecting "wholesale sealing" of papers partly because "limited redaction [might] be appropriate").

Here, moreover, our ability to assess whether the district court was justified in refusing to redact the 11 documents that remain sealed is hampered by a lack of specific findings. See In re Globe Newspaper Co., 729 F.2d at 56 (requiring a trial court that rejects alternatives to sealing to make specific findings to facilitate appellate review). The court did say, generally, that "in those rare cases where counsel find it necessary to refer to grand jury matters or other matters not properly disclosable, those references are almost invariably dispersed throughout the memoranda and inextricably intertwined with the references to applicable legal authority." D. Ct. Op. at 13. But the First Amendment requires consideration of the feasibility of redaction on a document-by-document basis, and the court's blanket characterization falls well short of this benchmark.

Having pointed out these defects in the non-dissemination order, we leave the matter of correction to the district court. Consistent with the core purpose of advisory mandamus, the principal value of our rulings is in terms of future cases. In respect to the Cianci case itself, the court is at the end of a lengthy trial; once the dust has settled, we are confident that the district court will set a reasonable timetable for determining whether previously submitted memoranda are to be placed on file in the clerk's office (with or without redaction); and, as to any memorandum withheld from filing, will enter specific findings as to the need for that restriction and the impracticality of redaction as an alternative to sealing. Within a reasonable time after the Cianci case and all related proceedings have ended — there is a "severed" defendant yet to be tried — we anticipate that the district court will consider the release of all documents and other materials then remaining under seal. Should the district court fail to act in a timely manner to effectuate the principles endorsed in this opinion — a contingency that we doubt will occur — THE JOURNAL is free to petition for ancillary relief.

## V. ANALYSIS: THE SECOND PETITION

We next grapple with THE JOURNAL's request for copies of the videotapes and audiotapes played at trial. In Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 494-97 (1975), the Supreme Court concluded that the media has a First Amendment right to publish

information contained in court records that are open to public inspection. A few years later, however, the Court rejected the argument that the First Amendment right of access allowed the media to obtain copies of tapes that had been entered into evidence at a criminal trial. Warner Communications, 435 U.S. at 608-10. Elaborating on this point, the Justices explained that the constitutional right to attend criminal trials morphed into a right to attend the trial sessions at which the tapes were played and to report upon what was seen and heard in the courtroom, but did not confer the right to replicate evidentiary materials in the custody of the court. Id. at 609.

Warner Communications is directly applicable here. As in that case, the district court has not restricted media access to, or the publication of, any information in the public domain. Indeed, the district court has gone to great lengths to facilitate access to the trial proceedings by, for example, reserving seats in the courtroom for members of the press and providing an overflow room for remote viewing. By affording interested members of the media ample opportunity to see and hear the tapes as they are played for the jury, the court has fulfilled its pertinent First Amendment obligations. See United States v. Beckham, 789 F.2d 401, 407 (6th Cir. 1986).

The demise of THE JOURNAL's First Amendment claim does not end the matter. The question remains whether the common-law right

-30-

to inspect and copy judicial documents affords a basis for relief. As said, this right of access extends to "materials on which a court relies in determining the litigants' substantive rights." Anderson, 805 F.2d at 13. Thus, videotapes and audiotapes on which a court relies in the determination of substantive rights are within its reach. See United States v. Graham, 257 F.3d 143, 151-53 (2d Cir. 2001). Because the videotapes and audiotapes that THE JOURNAL seeks to copy have been admitted into evidence, they fall into this category.

Viewed in this light, the question reduces to whether the common-law right of access is fulfilled by permitting the press and the public to see and hear such tapes, but not to copy them. To answer this question, THE JOURNAL cites a plethora of instances in which courts have allowed media outlets to obtain copies of tapes used in judicial proceedings. E.g., id. at 155-56; United States v. Myers (In re Application of Nat'l Broad. Co.), 635 F.2d 945, 952-54 (2d Cir. 1980). But this compendium only serves to prove that a trial court may allow the media to copy tapes that have been admitted into evidence; none of the constituent cases stands for the much different proposition that a trial court must afford such access.

Moreover, this case offers a unique twist. Here, the government has not merely played individual tapes, but, rather, has used cutting-edge technology (the Sanctions software) to play for

-31-

the jury medleys of selected excerpts from the universe of taped material stored on its laptop computer. As a result, there is no electronic medium — no tape or CD-ROM — currently in existence that contains the precise medleys of taped excerpts that have been played in open court. Consequently, we must decide whether the common-law right of access compels a court to create (or order the creation of) a new medium that contains only taped excerpts that have been played in open court. This is a question of first impression at the appellate level.

Historically, the common-law right of access permitted the public to copy the contents of written documents. In re Application of Nat'l Broad. Co., 635 F.2d at 950. Over time, the right has been extended to accommodate technological advancements in document reproduction such as photography, photocopying, and the replication of videotapes and audiotapes. Id. Invariably, however, these accommodations have covered materials that are "in a form that readily permits sight and sound reproduction." Id. at 952.

When, as now, the media seeks access to materials that do not exist in readily reproducible form, a new variable enters the equation. We are reluctant to hold that the common-law right of access necessarily compels the creation (and, thus, the copying) of such materials. We prefer instead to leave this decision, like many other decisions as to how best to effectuate the common-law

-32-

right of access, to the informed discretion of the trial court, so that it may be exercised with due regard for the idiosyncratic facts and circumstances of a specific case. See Warner Communications, 435 U.S. at 599; Anderson, 805 F.2d at 13. This approach seems especially appropriate here because the task of assessing whether the creation of an excerpt-only recording entails mere reproduction as opposed to extensive editing demands a particularized, fact-intensive inquiry.

This brings us to the ruling below. The district court denied THE JOURNAL's motion, holding that the common-law right of access did not mandate the creation of something not already in existence (i.e., a tape or CD-ROM containing only those excerpts played in open court) and finding replication infeasible. In this regard, the court made a number of specific findings highlighting difficulties inherent in THE JOURNAL's proposals for physical access to the taped excerpts. The court concluded, for example, that editing the source material to create a tape or CD-ROM containing only those excerpts played at trial was a far more daunting task than merely duplicating existing source materials. The court also found that the editing required to create tapes or CD-ROMs containing only the hundreds of taped conversations being played in open court would impose an appreciable burden on the court's staff, the parties, or both.

We decline THE JOURNAL's invitation to second-guess these findings. In the first place, the parties' representations as to how the software operates and how difficult it would be to reproduce the evidence seen and heard by the jurors are sharply conflicting. As a result, the record before us is hopelessly imprecise — and the Sanctions software package is not part of it. In the second place, the fact that the public and the press have had ample opportunity to see and hear the evidentiary tapes when those tapes were played in open court during trial takes much of the sting out of the district court's decision. Given these considerations, we cannot say that the district court abused its discretion in denying THE JOURNAL's request to compel the creation and production of excerpt-only tapes or CD-ROMs mimicking the materials actually played to the jury.[6] Cf. Valley Broad. Co. v. United States Dist. Ct., 798 F.2d 1289, 1295 & n.8 (9th Cir. 1986) (explaining that substantial administrative burdens alone may justify denial of access).

---

[6]We understand that written transcripts of the tapes have been marked as exhibits for identification in the Cianci trial. At first blush, it would seem that providing the media with copies of these transcripts might represent a relatively straightforward means of furthering access without imposing any significant burden upon the district court or the litigants. THE JOURNAL, however, did not raise the matter of the transcripts in either of its mandamus petitions, and, therefore, we decline to order this relief. Cf. Pratt v. United States, 129 F.3d 54, 62 (1st Cir. 1997) ("It is firmly settled in this circuit that arguments not advanced and developed in an appellant's brief are deemed waived.").

THE JOURNAL has a fallback position. It argues that the medleys of excerpts can be rerecorded as they are played in open court. The district court rejected this proposal based upon the clerk of court's representation that it was infeasible to tap into the audio/video feed to the broadcast monitors to rerecord the materials as they were being played in open court. The clerk explained that consultations with the court's technical staff and representatives of the vendor that had installed the courtroom presentation system had not yielded a practicable and cost-effective method of rerecording the audio/video transmission to the overflow room. The district court accepted this representation.

THE JOURNAL disputes the accuracy of the clerk's conclusion. Its position rests on a supplementary affidavit submitted on the eve of oral argument in this court. That affidavit suggests the existence of what THE JOURNAL describes as a technologically feasible method of rerecording the audio and video excerpts as they are played in open court. We decline to consider this belated proffer. See United States v. Slade, 980 F.2d 27, 30 (1st Cir. 1992) ("It is a bedrock rule that when a party has not presented an argument to the district court, she may not unveil it in the court of appeals."). THE JOURNAL is, of course, free to ask the district court to evaluate this new proposal.

## VI.  CONCLUSION

A high-profile, multi-defendant political corruption case is bound to test the mettle of the most experienced trial judge. We admire the manner in which Chief Judge Torres has responded to that challenge.  Although we, with a luxury of time that district judges rarely enjoy, have concluded that the court's non-dissemination order must be modified in certain respects, that conclusion in no way detracts from our overall assessment of the district court's exemplary performance.

We need go no further.  To recapitulate, we strike down the District of Rhode Island's blanket nonfiling policy for the handling of legal memoranda.  We uphold the district court's non-dissemination order, but direct the court, should it enter such orders in future cases, to include certain specified safeguards. As to the Cianci case itself, we leave the specifics of corrective action to the district court, consistent with the teachings of this opinion.  Finally, we deem the district court's refusal to provide THE JOURNAL with copies of videotapes and audiotapes an appropriate exercise of the court's discretion, given the peculiar circumstances of this case.

**It is so ordered**.