UNITED STATES of America

v.

Gary Lee SAMPSON

No. CR.01–10384–MLW.

United States District Court,
D. Massachusetts.

Nov. 17, 2003.

David A. Ruhnke, Ruhnke & Barrett, Montclair, NJ, Robert L. Sheketoff, Attorney at Law, Boston, MA, for Defendant.

Frank M. Gaziano, United States Attorney's Office, Boston, MA, George W. Vien, United States Attorney's Office, Boston, MA, John A. Wortmann, Jr., United States Attorney's Office, Boston, MA, for Plaintiff.

## MEMORANDUM AND ORDER

WOLF, District Judge.

Defendant Gary Sampson has pled guilty to two charges of carjacking resulting in death in violation of 18 U.S.C. § 2119(3). After a lengthy process involving responses to a detailed questionnaire and the individual voir dire of 146 potential jurors, a jury was empaneled solely to decide whether Sampson will be sentenced to death or to life in prison without possibility of parole under the Federal Death Penalty Act, 18 U.S.C. § 3591 *et seq.*

In its opening statement on November 5, 2003, the government played for the jury excerpts of Sampson's recorded confession to Michael Crisp of the Massachusetts State Police. In his opening statement, defense counsel played for the jury the recording of the telephone call that Sampson made to 911 in Vermont to turn himself in after murdering three people. The parties had agreed that in the course of the trial these recordings would be admitted as evidence. Crisp was the first witness to testify and a more complete version of Sampson's recorded confession to him was played for the jury, admitted as evidence, and made part of the public record.

The trial has been open to the public, with the proceedings broadcast to another courtroom to accommodate all interested in observing the proceedings. Seats have been reserved for members of the media. Transcripts of the recordings played in open court for the jury have, on request, been provided promptly to the media.

On November 6, 2003, WCVB–TV moved to intervene in this case for the limited purpose of seeking authorization to copy recordings, videotapes, and documents admitted as evidence. On November 7, 2003, WCVB–TV filed a memorandum in support of that motion. On November 12, 2003, a hearing was held on WCVB–TV's motion, which *The Boston Globe* then joined.

Sampson opposed the motion on the ground that it would endanger his right to a fair trial. More specifically, he contended that the broadcast of the recordings and the publication of gruesome photographs of the victims being admitted as evidence would inflame public passions and risk provoking members of the community to pressure jurors to sentence Sampson to be executed.

The government did not oppose the release of copies of the recordings admitted as evidence. However, the government did represent that the families of the victims opposed the release of the videotapes and photographs of the victims admitted into evidence because their broadcast and/or publication would violate the vic-

tims' rights to privacy and respect, and further traumatize their families and friends.

The court noted that the competing considerations concerning the public release of the recordings were different than those relating to the photographs and videotapes that depict the victims. WCVB–TV's memorandum directly addressed only the recordings. The court suggested that the issues relating to the photographs and videotapes depicting the victims would be moot if, on reflection, WCVB–TV and *The Boston Globe* decided that they would not maintain their requests for them because, out of respect for the victims or for other reasons, they would not broadcast or publish the photographs and videotapes in any event. On November 14, 2003, *The Boston Globe* filed a memorandum stating that it does not anticipate asking for copies of photographs of the bodies of the victims. WCVB–TV did not on November 13, 2003 file the affidavit concerning the photographs and videotapes depicting the victims that the court stated would be required before it would rule on that aspect of its request. Thus, the court is now deciding only whether the recordings played for the jury should be released to the media.[1]

■ WCVB–TV contends that it has a constitutional right, rooted in the First Amendment, to a copy of each recording admitted as evidence. The Supreme Court and the First Circuit have each held that this contention is incorrect. *See Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 608–10, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); *In re Providence Journal Co.,* 293 F.3d 1, 16 (1st Cir.2002). With regard to the media's First Amendment right, the instant case is comparable to *In re Providence Journal,* in which the First Circuit wrote:

[T]he district court has not restricted media access to, or the publication of, any information in the public domain. Indeed, the district court has gone to great lengths to facilitate access to the trial proceedings by, for example, reserving seats in the courtroom for members of the press and providing an overflow room for remote viewing. By affording interested members of the media ample opportunity to see and hear the tapes as they are played for the jury, the court has fulfilled its pertinent First Amendment obligations.

293 F.3d at 16.

■ There is, however, a presumption that the public has a common law right of access to documents relied upon in judicial proceedings which extends to the recordings admitted as evidence in the trial of this case. *Id.* at 9–10, 16–17. More specifically:

Courts long have recognized "that public monitoring of the judicial system fosters the important values of quality, honesty

---

1. On November 14, 2003, WCVB–TV filed a supplementary memorandum that primarily addresses questions the court raised concerning the recordings admitted as evidence. It did not file an affidavit addressing the photographs and videotapes depicting the victims. In the circumstances, the court is now deciding the motion for copies of the recordings. The court intends to continue to allow members of the media and the public to inspect the exhibits admitted as part of the public record at the end of each trial day. Except for photographs and videotapes depicting a victim, copies of those documentary exhibits will be provided to the media upon request. If the court receives a motion and supporting affidavit seeking one or more specific photographs or videotapes depicting a victim, it will decide whether the requested item(s) should be made available, perhaps after further briefing and hearing. This procedure is similar to that proposed by *The Boston Globe* in its November 14, 2003 memorandum.

and respect for our legal system." *Siedle v. Putnam Inv., Inc.*, 147 F.3d 7, 10 (1st Cir.1998) (citation and internal quotation marks omitted). This recognition has given rise to a presumption that the public has a common-law right of access to judicial documents. *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). This presumptive right of access attaches to those materials "which properly come before the court in the course of an adjudicatory proceeding and which are relevant to that adjudication." *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 412–13 (1st Cir.1987). It follows, than, that the common-law right of access extends to "materials on which a court relies in determining the litigants' substantive rights." *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 13 (1st Cir.1986). *Id.* at 9–10. "The appropriateness of making court files accessible is accentuated in cases where the government is a party: in such circumstances, the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch." *Standard Fin. Mgmt.*, 830 F.2d at 410.

▆▆▆ Nevertheless, "[t]hough the public's right of access to such materials is vibrant, it is not unfettered. Important countervailing interests can, in given instances, overwhelm the usual presumption and defeat access." *Siedle*, 147 F.3d at 10. However, " 'only the most compelling reasons can justify non-disclosure of judicial records' that come within the scope of the common-law right of access." *In re Provi-*

dence Journal*, 293 F.3d at 10 (quoting *Standard Fin. Mgmt.*, 830 F.2d at 410 (citation omitted)). "An accused's Sixth Amendment right to a fair trial plainly rises to the level of a compelling interest." *Id.* at 13.[2]

Generally, "a court must carefully balance the competing interests that are at stake in the particular case." *Siedle*, 147 F.3d at 10. In essence, the court has discretion, which must be " 'exercised in light of the relevant facts and circumstances of the particular case.' " *United States v. Connolly (In re Boston Herald, Inc.)*, 321 F.3d 174, 190 (1st Cir.2003) (quoting *Nixon*, 435 U.S. at 599, 98 S.Ct. 1306).

With regard to recordings admitted as evidence in criminal trials, the First Circuit has stated that "a trial court *may* allow the media to copy tapes that have been admitted into evidence; none of the constituent cases stands for the much different proposition that a trial court *must* afford such access." *In re Providence Journal*, 293 F.3d at 16–17 (emphasis in original). Courts have, in varying circumstances, exercised their discretion in various ways. In some instances, the recordings have not been made available to the media. *See Nixon*, 435 U.S. at 610, 98 S.Ct. 1306; *In re Providence Journal*, 293 F.3d at 16–19; *Belo Broad. Corp. v. Clark*, 654 F.2d 423, 434 (5th Cir.1981). In some cases, recordings have been provided to the media after the proceedings in which they were evidence had been concluded. *See United States v. Graham*, 257 F.3d 143, 147 (2d Cir.2001); *United States v.*

---

**2.** Also "[a]mong the countervailing factors favoring non-disclosure are: (i) prejudicial pretrial publicity; (ii) the danger of impairing law enforcement or judicial efficiency; and (iii) the privacy interests of third parties." *United States v. Salemme*, 985 F.Supp. 193, 195 (D.Mass.1997) (citing *United States v. Amodeo*, 71 F.3d 1044, 1047–50 (2d Cir.1995);

*United States v. McVeigh*, 119 F.3d 806, 813–14 (10th Cir.1997); *In re Globe Newspaper Co.*, 729 F.2d 47, 59 (1st Cir.1984)). *See also Gardner v. Newsday, Inc. (In re Newsday, Inc.)*, 895 F.2d 74, 79–80 (2d Cir.1990); *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179 (6th Cir.1983).

*Vazquez,* 31 F.Supp.2d 85, 88 (D.Conn. 1998). In other cases, it was ordered that recordings be, or should have been, released to the media while a prosecution was still in progress. *See United States v. Myers (In re Nat'l Broad. Co.),* 635 F.2d 945, 952–53 (2d Cir.1980); *Valley Broad. Co. v. United States Dist. Court,* 798 F.2d 1289, 1290, 1297 (9th Cir.1986).

The court concludes that in the instant case it is most appropriate to exercise its discretion to provide the media, during trial, copies of the recordings played for the jury and admitted into evidence. The presumption of public access to the recordings is reinforced by the strong and legitimate public interest in this case. This is only the second Federal Death Penalty Act prosecution in Massachusetts, a state which does not itself authorize execution as the punishment for any crime. It may have resulted from a change in Department of Justice policy which now permits the fact that a state's laws do not provide for the death penalty to alone create the substantial interest in federal prosecution necessary to prompt the initiation of a federal capital case. *See United States v. Sampson,* 275 F.Supp.2d 49, 54 n. 2, 91–92 (D.Mass.2003). There has, however, only been one federal case in which the death penalty has been imposed in a state—Michigan—which does not itself have the death penalty. *Id.* at 60.

Moreover, as of August 2003, in sixteen of the last seventeen penalty phase verdicts returned by juries in Federal Death Penalty Act cases the defendant was not sentenced to death. *Id.* at 59, 84–85. The record in this case now indicates that several recent verdicts have continued this trend.

Therefore, the public's interest in making informed decisions concerning the performance of the Department of Justice, the Court and, ultimately, the jury, is particularly strong. *See Standard Fin. Mgmt.,* 830 F.2d at 410. There is also "a significant public interest" in affording citizens an opportunity to hear the recordings "contemporaneously with the introduction of the tapes into evidence in the courtroom, when public attention is alerted to the ongoing trial." *Myers,* 635 F.2d at 952.

While the transcripts that have been released provide the public with a great deal of information, they are not a complete substitute for what the jury has heard. *Id.* For example, the way Sampson sounds in the 911 call and confessions may prove to have probative value for the jury. Thus, the broadcast of those recordings during trial may make the jury's eventual verdict more understandable, and therefore more legitimate, to the public.

In these circumstances the countervailing considerations are not sufficient to trump the presumed common law right of the media to the recordings. Significantly, it has not been argued that the release of the recordings will injure the privacy interests of the victims, their families, or any other third-parties. *See, e.g., Amodeo,* 71 F.3d at 1050–51.[3] Nor are there any related cases which might be injured by the publicity that broadcast of the recordings may generate. *Cf. Belo Broad.,* 654 F.2d at 432; *Myers,* 635 F.2d at 953.

---

**3.** In *Amodeo,* 71 F.3d at 1050–51, the Second Circuit stated that: "[t]he privacy interests of innocent third parties . . . should weigh heavily in a court's balancing equation. Such interests, while not always fitting comfortably under the rubric 'privacy,' are a venerable common law exception to the presumption of access." (citations and internal quotation marks omitted).

■ If the court were persuaded that the broadcast of the recordings would endanger its ability to afford the parties a fair trial, it would deny WCVB–TV's request for them. As indicated earlier, the right to a fair trial is a compelling interest and may in certain circumstances outweigh the presumption of a common law right to access to evidence. *In re Providence Journal,* 293 F.3d at 13. "[H]owever, . . . the public's (and the media's) right to know [cannot] be frustrated by the mere invocation of a threat to the accused's Sixth Amendment right to a fair trial." *Id.*

The jurors here have been instructed not to read, watch, or listen to anything relating to this case in the media. Their responses to daily inquiries indicate that they are obeying this instruction. Moreover, the jurors have already heard the recordings that may be broadcast. In these circumstances, the risk that they may inadvertently be exposed to broadcasts of the recordings does not outweigh the public's right to them. *See Myers,* 635 F.2d at 952–53.

Sampson has also expressed the concern that the broadcast of the recordings will provoke members of the community to pressure jurors to sentence him to death. However, the contents of the recordings have already been made available to the public when they were played in court and by the release of the related transcripts. No juror has reported any problem arising from this. Moreover, the recordings are not uniformly prejudicial to Sampson. Indeed, his counsel introduced the 911 call to the jury in his opening statement. Thus, there is not a likelihood that their broadcast will inordinately influence the public reaction to Sampson's crimes. Finally, to protect the jurors from possible pressure, the court has not yet placed their names in the public record. *See* Oct. 27, 2003 Order.[4] Therefore, the risk that broadcast of the recordings will result in improper pressure being placed on jurors is too speculative to overcome the public's presumed right to access to them.

■ Finally, releasing the recordings in the manner contemplated by the court will not threaten the integrity of the exhibits, the administration of justice, or the operation of the District Court. *See Standard Fin. Mgmt.,* 830 F.2d at 410; *Valley Broad. Co.,* 798 F.2d at 1295. " '[A] trial judge, in the interest of the fair administration of justice, [may] impose reasonable limitations on access to a trial.' " *Belo Broad.,* 654 F.2d at 428 (quoting *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 581 n. 18, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (plurality)). Thus, "[c]ourts may impose reasonable time, place, and manner restrictions on the press's right to access judicial records." *United States v. Hernandez,* 124 F.Supp.2d 698, 702–03 (S.D.Fla.2000). More specifically, as the Second Circuit stated in *Myers:*

> The opportunity for copying need not necessarily occur simultaneously with the presentation of evidence to the jury. [A] procedure for an opportunity to copy the tapes at the end of court sessions [is] an appropriate accommodation of the right of public access to judicial records with the orderly conduct of the trial.

635 F.2d at 952 n. 7.

In this case, the court will require written requests for the recordings at the conclusion of each trial day. The compact discs which contain the recordings will be

---

4. The court expects to do so when the case is concluded. *See United States v. Hurley (In re Globe Newspaper Co.),* 920 F.2d 88 (1st Cir. 1990); *United States v. Doherty,* 675 F.Supp. 719 (D.Mass.1987).

duplicated by the staff of the District Court as quickly as their other important responsibilities permit. They will be made available to the media at the published rate of $26 per disc. If there are many requests for the recordings, the court may accept WCVB–TV's offer to receive one copy and duplicate it for other members of the media.

Therefore, WCVB–TV's motion for copies of the recordings played for the jury and admitted as evidence in this case is hereby ALLOWED on the foregoing terms.