LIPEZ, Circuit Judge,
dissenting.
The Boston Herald intervened in the criminal trial of John J. Connolly, Jr., seeking to unseal three documents submitted by Connolly as part of his application under the Criminal Justice Act (“CJA”), 18 U.S.C. § 3006A (2000), for government payment of a portion of his attorney’s fees and legal expenses. Two documents are an original and amended CJA Form 23 affidavit, and the third document reflects Connolly’s outstanding legal fees at the time of his application. The CJA Form 23 requires applicants to provide detailed information about their family status, employment income, other assets (including other income, cash, and property) and debt obligations.
The magistrate judge denied the Herald’s motion, determining that “[tjhere is no First Amendment right of access to CJA-related backup documentation, motions, orders and hearing transcripts.... Further, the [CJA] statute and regulations ... supercede the common law right if one existed.” Noting that he had originally sealed the documents because their disclosure would “unduly intrude upon the privacy of the defendant,” the magistrate judge reaffirmed his earlier position: “I decline to exercise my discretion to unseal the documents at this time because I find that the intrusion on the privacy of the defendant and that of his family if the documents were released would be as substantial now as it was when the sealing orders were entered.”
This disposition of the Boston Herald’s claims is tantamount to a ruling that CJA eligibility forms, which contain only personal financial information, may be shielded from public disclosure without balancing the public interest in a particular applicant’s eligibility information against the degree of intrusion into the applicant’s privacy. Because I conclude that a qualified right of public access attaches to CJA eligibility information under both the common law and the First Amendment, I cannot agree with the majority’s decision to uphold the magistrate judge’s summary dismissal of the Boston Herald’s claims. The public right of ac *192 cess under these two doctrines constrains the discretion of judges to seal CJA Form 23 information. Accordingly, I would remand this case for a determination of whether the public’s right of access under the First Amendment is overcome “by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.” In re Providence Journal Co., 293 F.3d 1, 11 (1st Cir.2002) (citing Press-Enterprise v. Superior Court, 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (“Press-Enterprise I ”)).
I.
A. The Judicial Character of the Documents
Documents generated in the course of a judicial proceeding must be “judicial” documents to trigger a common law presumption of access. This judicial character is also a necessary but not sufficient condition to establish a qualified right of access under the First Amendment. See Providence Journal, 293 F.3d at 9-10. Thus, the Boston Herald has no claim of access to materials classified as “administrative” documents. See El Dio, Inc. v. Hernandez Colón, 963 F.2d 488, 495 (1st Cir.1992); FTC v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 408 (1st Cir.1987). Therefore, I first address the question of whether the CJA eligibility forms are judicial documents.
1. The Role of Judges in the Eligibility Inquiry
The CJA anticipates the involvement of a “United States magistrate judge or the court” in nearly every phase of the appointment process, including the generation of a plan for furnishing representation, 18 U.S.C. § 3006A(a), the determination of whether appointment of counsel is appropriate, 18 U.S.C. § 3006A(b), the determination of the duration of appointments, 18 U.S.C. § 3006A(c), the waiver of the maximum compensation rates when justice demands, 18 U.S.C. § 3006A(d)(3), the public disclosure of the amounts paid to appointed counsel, 18 U.S.C. § 3006A(d)(4), and the authorization of reimbursement for investigative, expert, or other services deemed necessary for adequate representation, 18 U.S.C. § 3006A(e)(l). Indeed, the regulations promulgated to implement the CJA explicitly state that “[t]he determination of eligibility for representation under the Criminal Act is a judicial function to be performed by a federal judge or magistrate after making appropriate inquiries concerning the person’s financial condition.” VII Administrative Office of the United States Courts’ Guide to Judiciary Policies and Procedures (hereinafter “AO. Guide”) § 2.03 (2001) (emphasis added).
Congress’s decision to delegate this authority exclusively to judges is not surprising — ensuring that criminal defendants receive the full benefits of the Sixth Amendment’s guarantee of effective assistance of counsel has always been the unique province of the judiciary. Judges are required, inter alia, to establish that criminal defendants who proceed pro se have knowingly and intelligently waived their right to counsel, see United States v. Manjarrez, 306 F.3d 1175, 1179 (1st Cir. 2002), to appoint counsel who are appropriately “learned in the law” to represent defendants facing capital charges, United States v. Miranda, 148 F.Supp.2d 292 (S.D.N.Y.2001), and to exempt applicants from the statutory requirement of filing a CJA Form 23 where doing so would prejudice the defendant’s other constitutional rights, see United States v. Gravatt, 868 F.2d 585, 589 (3d Cir.1989) (reversing trial *193 court’s denial of request for appointed counsel where applicant was charged with tax evasion and refused to complete the CJA Form 23 on grounds that it would be self-incriminating); United States v. Moore, 671 F.2d 139, 141 (5th Cir.1982), cert. denied, 464 U.S. 859, 104 S.Ct. 183, 78 L.Ed.2d 163 (1983) (same); United States v. Anderson, 567 F.2d 839, 840 (8th Cir.1977) (same). The judicial character of the eligibility inquiry that determines a defendant’s Sixth Amendment right to counsel is not undermined by the fact that administrative personnel are occasionally entrusted with judgments that effectuate constitutional rights in settings outside the courtroom, where one would not expect judges to render initial decisions. See, e.g., Estelle v. Gamble, 429 U.S. 97, 102-04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (adjudicating prisoner’s claim that prison doctor violated Eighth Amendment by refusing to provide adequate medical care).
Congress also mandated that the judge undertake an individualized inquiry into a defendant’s financial ability to retain counsel:
[T]he United States magistrate judge or the court, if satisfied after appropriate inquiry that the person is financially unable to obtain counsel, shall appoint counsel to represent him. Such appointment may be made retroactive to include any representation furnished pursuant to the plan prior to appointment. The United States magistrate or the court shall appoint separate counsel for persons having interests that cannot properly be represented by the same counsel, or when other good cause is shown.
18 U.S.C. § 3006A(b) (emphasis added). Implicitly, this provision acknowledges the important relationship between an applicant’s financial status and the circumstances of the underlying case. An applicant with moderate resources may nevertheless qualify for appointed counsel under the CJA for representation in a complex murder trial, whereas a defendant of considerably lesser means may not be eligible for representation in a prosecution for a less serious offense. The judge conducting the trial or a magistrate judge equally familiar with the facts and proceedings of the case is uniquely positioned to assess the applicant’s financial position against the backdrop of past, present and anticipated expenditures in the underlying action.
Significantly, the CJA further obliges the judge to continually reevaluate the need for appointed counsel as the underlying proceeding progresses:
If at any time after the appointment of counsel the United States magistrate judge or the court finds that the person is financially able to obtain counsel or to make partial payment for the representation, it may terminate the appointment of counsel, or authorize payment ... as the interests of justice may dictate. If at any stage of the proceedings, including an appeal, the United States magistrate judge or the court finds that the person is financially unable to pay counsel whom he had retained, it may appoint counsel ... and authorize payment ... as the interests of justice may dictate. The United States magistrate judge or the court may, in the interests of justice, substitute one appointed counsel for another at any stage of the proceedings.
18 U.S.C. § 3006A(c). Under the CJA, administrative personnel assist magistrate and district judges in rendering eligibility determinations by generating CJA forms, accepting service of CJA application materials, and helping “to obtain or verify the facts upon which [the eligibility] determination is to be made.” VII A. O. Guide *194 § 2.03(B). However, these individuals lack the expertise to weigh “the interests of justice” when considering whether to approve or withdraw an appointment at an intermittent stage in the proceedings, and would also be hard-pressed to continuously monitor the developments in the underlying case. These realities reinforce the wisdom of Congress’s decision to repose CJA decisionmaking authority in judges.
2. The Role of CJA Form 23 Information in the Eligibility Inquiry
While the critical role that judges play in the eligibility inquiry evinces the judicial character of the documents they rely upon, the dispositive significance of those documents further enhances their “judicial” status. In United States v. Amodeo, 44 F.3d 141 (2d Cir.1995) (“Amodeo I”), the Second Circuit established the following functional definition of “judicial document”: ‘We think that the item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document.” Id. at 145.[9] This definition distinguishes CJA eligibility forms from other documents generated in judicial proceedings, such as materials produced during discovery, that courts are often reluctant to classify as “judicial documents”:
[I]t must be recognized that an abundance of statements and documents generated in federal litigation actually have little or no bearing on the exercise of Article III judicial power. The relevance or reliability of a statement or document cannot be determined until heard or read by counsel, and, if necessary, by the court or other judicial officer. As a result, the temptation to leave no stone unturned in the search for evidence material to a judicial proceeding turns up a vast amount of not only irrelevant but also unreliable material. Unlimited access to every item turned up in the course of litigation would be unthinkable. Reputations would be impaired, personal relationships ruined, and businesses destroyed on the basis of misleading or downright false information.
United States v. Amodeo, 71 F.3d 1044, 1048-49 (2d Cir.1995) (‘Amodeo II”); see Seattle Times Co. v. Rhinehart, 467 U.S. 20, 33, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984); Anderson v. Cryovac, Inc., 805 F.2d 1, 13 (1st Cir.1986). Yet the relevance and reliability vexations afflicting the discovery process are inapplicable to CJA eligibility information, which is (1) submitted under penalty of perjury and thus presumptively reliable, and (2) singularly relevant to the court’s determination of whether an applicant is entitled to appointed counsel. See United States v. Salemme, 985 F.Supp. 197, 201 (D.Mass. 1997) (“Typically, the CJA 23 form of financial affidavit ... is used to determine *195 whether a defendant is eligible for the appointment of counsel.”).
3. The Narrow Scope of the “Administrative Document” Exception
The critical role that judges play in the eligibility determination, coupled with the significance of the financial documents themselves to that determination, counsel strongly in favor of classifying the eligibility forms as judicial documents. The majority suggests, however, that the CJA eligibility forms fall outside the category of judicial documents by virtue of their “administrative” character, characterizing the documents as “administrative paperwork generated as part of a ministerial process ancillary to trial.” Yet we, along with the Second Circuit, have recognized that courts act at the apex of their Article III power whenever they conduct proceedings that determine the substantive rights of litigants: “[T]he strong weight to be accorded the public right of access to judicial documents [is] largely derived from the role those documents play[] in determining litigants’ substantive rights — conduct at the heart of Article III — and from the need for public monitoring of that conduct.” Amodeo II, 71 F.3d at 1049; see Providence Journal, 293 F.3d at 9-10 (“[T]he common-law right of access extends to ‘materials on which a court relies in determining the litigants’ substantive rights.’ ” (quoting Cryovac, 805 F.2d at 13)).
Thus, courts may act pursuant to their Article III authority in proceedings antecedent to a criminal trial even when they address matters that are peripheral to the merits of the underlying dispute. Cfi Providence Journal, 293 F.3d at 10 (“The constitutional right of access [to judicial records] is not limited to the actual trial itself, but also encompasses most pretrial proceedings.”). The Supreme Court acknowledged as much in Press-Enterprise I, ruling that a qualified right of public access attached to the transcript of the voir dire examination of potential jurors in a criminal trial. See Press-Enterprise I, 464 U.S. at 501, 104 S.Ct. 819. Indeed, we ruled in Standard Financial that a common law right of public access attached to financial documents that a district court reviewed in determining whether to approve a consent decree between the Federal Trade Commission and a corporation accused of engaging in deceptive marketing practices. Standard Financial, 830 F.2d at 405. Because the court had conditionally approved the consent decree before examining the documents in question, the plaintiffs argued that “the statements could not have been court records upon which [the judge] relied in the adjudicatory process.” Id. at 408. We disagreed, finding that the plaintiffs’ argument “takes too restrictive a view of what constitutes a court record for the purpose of allowing public access.” Id. at 408, 830 F.2d 404.
Here, the CJA eligibility forms are more proximately connected to a court’s determination of substantive rights than either the voir dire transcript in Press-Enterprise I or the financial documents submitted to gain approval for a consent decree in Standard Financial. As a threshold matter, the eligibility inquiry determines an applicant’s substantive right to counsel under both the Sixth Amendment and the CJA itself, to the extent that particular courts may expand their conception of financial need such that the statutory and constitutional standards are not coextensive. Moreover, this inquiry occurs within the same adversarial setting that typifies other judicial determinations of substantive rights. See United States v. Coniam, 574 F.Supp. 615, 617 (D.Conn. 1983) (“The role of the government in relation to the utilization of the CJA appropriation for the guarantee of defendant’s *196 rights, while nowhere specified, is nonetheless appropriately invited by the approval of an adversarial process by which to insure the propriety of defendant’s receipt of services of counsel under the CJA”) (citing United States v. Harris, 707 F.2d 653, 662 (2d Cir.1983)). Thus, the government is entitled and encouraged to contest CJA appointments for applicants it deems unworthy, see United States v. Hickey, 997 F.Supp. 1206, 1207 (N.D.Cal. 1998); United States v. Herbawi, 913 F.Supp. 170, 173 (W.D.N.Y.1996), and to actively defend a court’s decision to deny appointed counsel if the spurned applicant challenges the decision on appeal, see United States v. Lefkowitz, 125 F.3d 608, 621 (8th Cir.1997); Harris, 707 F.2d at 660-62.
Under Connolly’s narrower conception of Article III, a court only exercises Article III power to resolve the merits of the underlying case or controversy: “Article III functions — i.e., the adjudication of federal cases and controversies — are those which the Constitution assigns uniquely to the federal courts.” The application of this rule would have the odd result of creating a qualified right of public access to only those financial affidavits that become the subject of an appeal, where the applicant’s financial information would be inextricably linked with the merits in the appellate proceeding. The supposition that a bona fide public interest in CJA eligibility only materializes if and when a party appeals the court’s initial eligibility determination is difficult to harmonize with the principles underlying the common law presumption of access to judicial documents:
The presumption of access is based on the need for federal courts, although independent — indeed, particularly because they are independent — to have a measure of accountability and for the public to have confidence in the administration of justice.... Although courts have a number of internal checks, such as appellate review by multi-judge tribunals, professional and public monitoring is an essential feature of democratic control. Monitoring both provides judges with critical views of their work and deters arbitrary judicial behavior. Without monitoring, moreover, the public could have no confidence in the conscientiousness, reasonableness, or honesty of judicial proceedings.
Amodeo II, 71 F.3d at 1048. The importance of this monitoring function does not fluctuate between an original and appellate proceeding under the CJA, and therefore any rule that purports to confine the Article III imprimatur to documents that directly inform the adjudication of the underlying case or controversy is unduly narrow.
I acknowledge that administrative personnel play an important supporting role in the eligibility inquiry prior to the judicial determination of eligibility. Nevertheless, the administrative features of the eligibility inquiry do not erode the fundamental Article III character of CJA eligibility forms, thereby transforming them into “administrative” documents. Excepting the decision of the Tenth Circuit in United States v. Gonzales, 150 F.3d 1246 (10th Cir.1998), no court to my knowledge has invoked the judicial/administrative distinction to carve an “administrative” exception to the presumptively judicial character of documents that must be filed with the court as a required basis for judicial decision making. Indeed, many jurisdictions simply accord “judicial document” status to all materials filed with the court, regardless of the particular judicial function for which the documents are relevant. See supra.
*197 To the extent that some courts have fashioned a distinction between “judicial” and “administrative” documents, this distinction has been cast in institutional terms and employed narrowly to shield state and federal executive branch materials from the presumption of access accorded documents in judicial proceedings. Thus, in El Dia, we upheld an executive order issued by the governor of Puerto Rico limiting access to documents detailing his off-island travel expenses, observing that “[wjhile the Supreme Court has recognized a qualified First Amendment right of access to records and proceedings connected to the criminal justice system ... the Court has never recognized a corresponding right of access to Executive Branch documents.” El Dia, 963 F.2d at 494-95 (internal citations omitted). Similarly, the Supreme Court refused to extend First Amendment protection to members of the media attempting to photograph and tour a county jail where an inmate had recently committed suicide, purportedly in response to deteriorating conditions at the prison. Houchins v. KQED, Inc., 438 U.S. 1, 3, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978). According to the plurality:
Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government’s control ... [Ujntil the political branches decree otherwise, as they are free to do, the media have no special right of access to the [jail] different from or greater than that accorded the public generally.
Id. at 15-16, 98 S.Ct. 2588. The broad institutional and political considerations that informed the decisions in El Día and Houchins are not implicated by media requests for the financial information filed by CJA applicants in the midst of a criminal proceeding. Indeed, these documents could not be considered “information within the government’s control” as that phrase is used in Houchins. Id. at 15, 98 S.Ct. 2588.
Although the public’s right of access to judicial documents under the common law and the First Amendment “are not coterminous, courts have employed much the same type of screen in evaluating their applicability to particular claims.” Providence Journal, 293 F.3d at 10. However, there are important differences between the two rights of access:
The distinction between the rights afforded by the first amendment and those afforded by the common law is significant. A first amendment right of access can be denied only by proof of a “compelling governmental interest” and proof that the denial is “narrowly tailored to serve that interest.” Globe Newspaper [Co. v.Super. Ct.], 457 U.S. [596], 606, 102 S.Ct. 2613, 73 L.Ed.2d 248 [ (1982) ]. In contrast, under the common law the decision to grant or deny access is “left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular1 case.” Nixon v. Warner Communications, Inc., 435 U.S. 589, 599, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978).
Baltimore Sun, 886 F.2d at 64. Accordingly, I proceed to evaluate the scope of the public right of access to the Connolly judicial documents under both the common law and the First Amendment.
B. The Presumption of Public Access Under the Common Law
The determination that particular documents are “judicial” documents ipso fac-to establishes a presumptive right of public access under the common law: “Courts long have recognized that public monitoring of the judicial system fosters the important values of quality, honesty *198 and respect for our legal system. This recognition has given rise to a presumption that the public has a common-law right of access to judicial documents.” Providence Journal, 293 F.3d at 9 (internal citations omitted). “This presumptive right of access attaches to those materials ‘which properly come before the court in the course of an adjudicatory proceeding and which are relevant to that adjudication.’ ” Id. (quoting Standard Financial, 830 F.2d at 412-13 (1st Cir.1987)). However, not all presumptions of access are created equal:
We believe that the weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court’s purview solely to insure their irrelevance.
Amodeo II, 71 F.3d at 1049. Here, the CJA Form 23 information unmistakably falls on the “strong presumption” end of the Article III continuum. While the judge conducting the eligibility inquiry has the discretion to consider other factors, such as the nature of the proceeding for which the defendant seeks appointed counsel, the applicant’s financial status is, for obvious reasons, of the utmost importance to the court. In many cases, the financial documents may be the only evidence submitted in the eligibility proceeding, a consideration that significantly strengthens the common law presumption of access: “Judicial records are presumptively subject to public inspection.... [T]he presumption is at its strongest when the document in question, as here, has been submitted as a basis for judicial decision making.” Greater Miami Baseball Club Ltd. v. Selig, 955 F.Supp. 37, 39 (S.D.N.Y.1997) (citing Joy v. North, 692 F.2d 880, 893 (2d Cir.1982)).
While the caselaw supports the recognition of a common law presumption of access to Connolly’s eligibility forms, the magistrate judge stated in his decision that “the [CJA] statute and regulations ... supercede the common law right if one existed.” (citing Gonzales, 150 F.3d at 1263). That sweeping assertion must be measured against familiar standards. In United States v. Texas, 507 U.S. 529, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993), the Supreme Court recognized the
longstanding ... principle that “statutes which invade the common law are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.” In such cases, Congress does not write upon a clean slate. In order to abrogate a common-law principle, the statute must “speak directly” to the question addressed by the common law.
Id. at 529,113 S.Ct. 1631 (internal citations omitted). Accordingly, under well-settled principles of statutory construction, courts will not construe a statute as derogative of the common law unless Congress explicitly articulates that intent:
The courts have consistently held legislation derogative of the common law accountable to an exactness of expression, and have not allowed the effects of such legislation to be extended beyond the necessary and unavoidable meaning of its terms. The presumption runs against such innovation. This is merely a familiar principle of statutory construction.
Scharfeld v. Richardson, 133 F.2d 340, 341 (D.C.Cir.1942).
*199 The language of the CJA reflects Congress’s sensitivity to these background principles. Where Congress identified a need to preserve confidentiality during the CJA appointment process, it expressly did so through statutory provisions narrowly addressed to particular documents and proceedings. See 18 U.S.C. § 3006A(d)(4) (directing courts to delay or limit the disclosure of payment information where doing so would undermine inter alia the defendant’s constitutional rights, the attorney-client privilege, or the work product privilege); 18 U.S.C. § 3006A(e) (authorizing courts to approve payment for “investigative, expert, or other services necessary for adequate representation .... [u]pon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them”) (emphasis added).[10]
By contrast, neither the statute nor the A.O. Guide refers specifically to the confidentiality or disclosure of CJA.Form 23 information, which ordinarily does not implicate a defendant’s Fifth Amendment rights.[11] Instead, the implementing regulations promulgated by the Administrative Office of U.S. Courts establish a general presumption of disclosure that encompasses the CJA processes and documents that do not receive individualized treatment in the statute itself:
Generally, such information [pertaining to activities under the Criminal Justice Act and related statutes] which is not otherwise routinely available to the public should be made available unless it is judicially placed under seal, or could reasonably be expected to unduly intrude upon the privacy of attorneys or defendants; compromise defense strategies, investigative procedures, attorney work product, the attorney-client relationship or privileged information provided by the defendant or other sources; or otherwise adversely affect the defendant’s right to the effective assistance of counsel, a fair trial, or an impartial adjudication.
AO. Guide § 5.01(A) (emphasis added). This provision of the guidelines, which controls where Congress does not bar the disclosure of particular CJA materials with an “exactness of expression,” see Scharfeld, 133 F.2d at 341, is essentially a regulatory codification of the balancing exercise that courts employ once a qualified public right of access has attached to judicial documents under the common law. Compare Amodeo II, 71 F.3d at 1050-51, with VII A.O. Guide § 5.01(A). By specifying that CJA materials should be released unless the materials “unduly intrude upon *200 the privacy of attorneys or defendants,” AO. Guide § 5.01(A) (emphasis added), the regulations signal judges that the magnitude of the intrusion must be weighed against the benefits of public disclosure. Accordingly, the law and the guidelines appear not to preempt, but rather to ratify, a common law presumption of access to the information at issue here.
C. The Public Right of Access Under the First Amendment
In Press-Enterprise v. Superior Court, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (Press-Enterprise II), the Supreme Court articulated the test for determining when a First Amendment right of public access attaches to judicial documents:
In cases dealing with the claim of a First Amendment right of access to criminal proceedings, our decisions have emphasized two complementary considerations. First, because a “tradition of accessibility implies the favorable judgment of experiences,” we have considered whether the place and process have historically been open to the press and general public [the “experience” prong].
Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question [the “logic” prong].
Press-Enterprise II, 478 U.S. at 8-9, 106 S.Ct. 2735 (internal quotation marks omitted).[12] While Connolly contends that both prongs of this standard must be satisfied for a qualified First Amendment right of public access to attach, at least two courts have recognized a qualified First Amendment right to CJA materials on the strength of the “logic” prong alone. See United States v. Suarez, 880 F.2d 626, 631 (2d Cir.1989); United States v. Ellis, 154 F.R.D. 692, 696 (M.D.F1.1993). As the Second Circuit observed in Suarez:
It is true that there is no long “tradition of accessibility” to CJA forms. However, that is because the CJA itself is, in terms of “tradition,” a fairly recent development, having been enacted in 1964.... The lack of “tradition” with respect to the CJA forms does not detract from the public’s strong interest in how its funds are being spent in the administration of criminal justice and what amounts of public funds are paid to particular private attorneys or firms.
Suarez, 880 F.2d at 631. This lack of tradition for criminal proceedings of recent origin places intervenors like the Boston Herald in the awkward position of analogizing the documents or proceedings at *201 issue to materials or proceedings with traditions of accessibility. Such analogies can be useful but not decisive. They are inevitably assailable on grounds that the comparison is imperfect, or that application of the tradition would prove too much. In the end there is no sound reason to exclude criminal proceedings of recent origin from the reach of the First Amendment simply because they cannot match the lineage of proceedings that have long been part of the criminal process. Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. 2735.
In explaining the logic prong, the Supreme Court has recognized that the right of access to judicial proceedings
plays a particularly significant role in the functioning of the judicial process and the government as a whole. Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole. Moreover, public access ... fosters an appearance of fairness, thereby heightening respect for the judicial process. And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process — an essential component in our structure of self-government.
Globe Newspaper, 457 U.S. at 606, 102 S.Ct. 2613. In United States v. Suarez, 880 F.2d 626 (2d Cir.1989), the Second Circuit determined that the benefits of public scrutiny outlined in Globe Newspaper apply with equal force to the CJA appointment process:
Because there is no persuasive reason to ignore the presumption of openness that applies to documents submitted in connection with a criminal proceeding, we conclude that the public has a qualified First Amendment right of access to the CJA forms after payment has been approved.
Id. at 631.[13]
As I read the precedents, the Supreme Court did not intend the logic prong to limit the reach of the First Amendment only to those judicial processes that would realize efficiency and accuracy gains in the “sunshine” of public access. On the contrary, Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 569, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), and its progeny, see Press-Enterprise I, 464 U.S. at 505, 104 S.Ct. 819; Globe Newspaper, 457 U.S. at 606, 102 S.Ct. 2613, suggest that the benefits accruing to society from a right of public access to judicial documents and proceedings are assumed prima facie under the logic prong. Accordingly, as the language of Press Enterprise II suggests, satisfaction of the logic prong turns on the narrower question of whether public disclosure would defeat the purpose of the specific judicial process at issue:
Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question. Although many government processes operate best under public scrutiny, it takes little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly. A classic example is that “the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings.”
*202 Press-Enterprise II, 478 U.S. at 8-9, 106 S.Ct. 2735 (quoting Douglas Oil Co. v. Petrol Stops N.W., 441 U.S. 211, 218, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979)). The Ninth Circuit echoed this theme in Times Mirror Co. v. United States, 873 F.2d 1210 (9th Cir.1989):
Every judicial proceeding, indeed every governmental process, arguably benefits from public scrutiny to some degree, in that openness leads to a better-informed citizenry and tends to deter government officials from abusing the powers of government. ... Certainly, the public’s interest in self-governance and prevention of abuse of official power would be served to some degree if grand jury proceedings were opened. The same might be said of jury deliberations and the internal communications of this court. But because the integrity and independence of these proceedings are threatened by public disclosures, claims of “improved self-governance” and “the promotion of fairness” cannot be used as an incantation to open these proceedings to the public.
Id. at 1213 (internal citations omitted).
The nature and degree of “procedural frustration” required to remove a class of judicial documents submitted in a criminal case from First Amendment scrutiny has been well documented by courts adjudicating petitions to publicly disclose the pre-sentence reports of convicted defendants. As the jurisprudence in this area illustrates, the three primary parties to every criminal proceeding — the defendant, the government and the judge — have differing interests in maintaining the confidentiality of certain judicial documents. The defendant’s interest is often privacy-based, as noted in the context of presentence reports: “The criminal defendant has a strong interest in maintaining the confidentiality of his or her presentence report ... the presentence investigation often involves a broad-ranging inquiry into a defendant’s private life, not limited by traditional rules of evidence.” United States v. Corbitt, 879 F.2d 224, 230 (7th Cir.1989).
Confidentiality serves a different function for courts. The accuracy and fairness of judicial determinations depends in large part on the informative value of the judicial documents submitted to the court. To the extent that public disclosure of presen-tence reports would create disincentives for the defendant, the government or independent third parties to provide information that would aid the court’s determination, recognizing a public right of access under the First Amendment could undermine the sentencing process. As the Seventh Circuit observed: “[R]equiring disclosure of a presentence report is contrary to the public interest as it would adversely affect the sentencing court’s ability to obtain data on a confidential basis from the accused and from sources independent of the accused for use in the sentencing process.” United States v. Greathouse, 484 F.2d 805, 807 (7th Cir.1973).
Finally, the government may ask courts to seal documents that contain information about confidential informants, reveal the strategies employed by the police to apprehend criminals, or otherwise undermine law enforcement objectives. In Corbitt, the Seventh Circuit enumerated the government’s interests in maintaining the confidentiality of presentence reports:
The presentence report will often contain information regarding the defendant’s past or future cooperation with the government. The report may also include information conveyed by informants or cooperating codefendants regarding the defendant’s relative culpability for the offense for which he has been convicted, and the defendant’s involvement in other crimes which may be *203 under investigation. Especially where the defendant was a member of an organized, ongoing criminal enterprise, disclosure may pose a substantial risk of retaliation against the defendant.... Therefore widespread disclosure of the presentence report may obstruct the government’s ability to investigate crimes.
Corbitt, 879 F.2d at 235. In toto, these misgivings mirror the concerns that led courts to shield grand jury proceedings from public access, id. at 232 n. 8 (listing cases), and have since been echoed by other courts declining to recognize a constitutional right of access to presentence reports. See United States v. Huckaby, 43 F.3d 135, 138 (5th Cir.1995); United States v. Schlette, 842 F.2d 1574, 1579-81 (9th Cir.1988).
Of all the ills associated with the disclosure of presentence reports, only the defendant’s interest in privacy is implicated by the disclosure of CJA financial affidavits. Unlike the process of developing presentence reports, where the court must cast a wide net to retrieve important information from multiple sources, the CJA eligibility inquiry relies primarily on the defendant to provide the critical information. Accordingly, the public disclosure of CJA eligibility information would not stifle a flow of information from diverse sources, as it might in the presentence report context. Similarly, because the CJA Form 23 is concerned solely with the applicant’s financial status, and does not provide a medium for exposing government informants or revealing other sensitive law enforcement secrets, the government has no vested interest in ensuring the confidentiality of these financial affidavits.
Nonetheless, the majority posits that the CJA appointment process is uniquely susceptible to privacy-based “frustration,” reasoning that prospective CJA applicants will be deterred from seeking court-appointed counsel by the prospect that their financial affidavits will be publicly disclosed. However, indigent criminal defendants facing hefty fines, long incarceration, or both are unlikely to forego the opportunity to seek court-appointed counsel out of concern for the confidentiality of their financial information.[14] In the absence of any discernible court or government interest in the confidentiality of CJA eligibility information, the majority’s holding that an intrusion into the defendant’s privacy, without more, “totally frustrates” a judicial *204 proceeding, see Press-Enterprise II, 478 U.S. at 8,106 S.Ct. 2735, expands unjustifiably the range of judicial documents and procedures integral to the criminal process but shielded from First Amendment scrutiny.[15] In my view, Connolly’s privacy concerns do not defeat the logic prong of Press-Enterprise II, and a qualified First Amendment right of access attaches to the financial affidavits.[16]
II.
The majority states in the alternative that “[e]ven assuming that CJA eligibility documents were covered by a common law presumption of access, we should still affirm the magistrate judge’s decision to maintain the sealing of Connolly’s CJA application materials.” In support of this position, the majority cites our decision in Siedle v. Putnam Invs. Inc., 147 F.3d 7 (1st Cir.1998), for the proposition that “[t]he trial court enjoys considerable leeway in making decisions of this sort.” Id. at 10. Yet in Siedle, we stressed that these sealing determinations are only entitled to deference if they reflect a careful balancing of the competing interests at stake:
[W]hen a party requests a seal order, or, as in this case, objects to an unsealing order, a court must carefully balance the competing interests that are at stake in the particular case ... The trial court enjoys considerable leeway in making decisions of this sort. Thus, once the trial court has struck the balance, an appellate court will review its determinations only for mistake of law or abuse of discretion.
Id. at 10 (emphasis added).
Respectfully, I do not believe that the magistrate judge carefully balanced the competing interests in this case. The judge expressly determined that “the Boston Herald has no First Amendment or federal common law right of access to the documents,” and summarily concluded that “the intrusion on the privacy of the defendant and that of his family if the documents were released would be as substantial now as it was when the sealing orders were entered.” By declining to even acknowledge a common law presumption of access, the magistrate judge excluded any competing public interests from the deci-sional calculus, and denied the Boston Herald the rigorous balancing determination it is entitled to once the common law right attaches. See Providence Journal, 293 F.3d at 11 (“[OJnly the most compelling reasons can justify non-disclosure of judicial records that come within the scope of the common-law right of access.”).
*205 As Providence Journal suggests, application of the common law presumption of access imposes a heavy burden on the party seeking to seal judicial documents. Indeed, applying the common law standard, courts have unsealed portions of judicial documents containing arguably more sensitive information than the financial data required by the CJA Form 23 affidavit. In United States v. Kaczynski, 154 F.3d 930 (9th Cir.1998), the Ninth Circuit upheld the district court’s decision to unseal redacted portions of Theodore Kaczynski’s psychiatric competency report after he entered a guilty plea in the notorious “Unabomber” case: “In balancing the competing interests of the parties, the district court did not abuse its discretion. It determined that, as to the unredacted part of the report, the media’s need for disclosure outweighed Kaczynski’s privacy interests.” Id. at 932. Similarly, in United States v. Huckaby, 43 F.3d 135 (5th Cir.1995), the Fifth Circuit, after acknowledging that “[t]he ordinary confidentiality of presentence reports is supported by powerful policy considerations,” upheld the trial court’s disclosure of defendant’s pre-sentence report after his conviction for tax evasion. Id. at 138-140. The “lengthy” report reflected an exhaustive accounting of defendant’s financial records, and concluded that Huckaby had failed to file state and federal income tax returns for both himself and his business. Id. The court agreed with the district judge that the strong public interest in the presentence report warranted disclosure:
The court hoped that the release of the [presentence report] would explain the basis of Huckaby’s prosecution so as to eliminate any shadow of doubt that this proceeding was racially motivated. Rather than allow bitterness to fester within the community as a result of Huc-kaby’s guilty plea and sentence, the court decided to juxtapose against the rhetoric on Huckaby’s behalf the seamy reality of his tax avoidance.
Id. at 140-41. We have also upheld the release of court documents containing personal financial information similar to the materials at issue here after balancing the public interest under the common law. See Standard Financial, 830 F.2d at 404.
CJA Form 23 financial information may present less weighty privacy concerns than psychiatric evaluations or pre-sentence reports. Moreover, since the government may theoretically challenge a judge’s decision to appoint counsel in every case, see, e.g., Harris, 707 F.2d at 660-62; Hickey, 997 F.Supp. at 1207, applicants cannot argue that they have a legitimate expectation of privacy in the CJA financial information, entitling them to protect their financial status from public disclosure throughout the eligibility process. To be sure, the privacy concerns of CJA applicants should be accorded their due weight by the judge. So too should the concerns of third parties whose financial ties to the defendant may expose them to unwarranted disclosures. But these concerns can be effectively addressed by narrowly tailored redactions of the financial affidavits. They do not justify giving short shrift to the public’s competing interest in order to prohibit disclosure entirely. At best, the magistrate judge gave inadequate consideration to the public’s interest in Connolly’s financial affidavits; the record more strongly suggests that the public interest received no consideration at all. Therefore, I cannot agree with the decision to defer to the magistrate judge’s exercise of discretion, even on the majority’s assumption of a common law presumption of access to the financial affidavits.
III.
The CJA eligibility forms at issue bear every hallmark of judicial documents: 1) *206 the eligibility proceeding potentially occurs within an adversarial setting, 2) the judge plays a critical role in the outcome, 3) the court relies heavily on the financial affidavits to reach its decision, and 4) the outcome of the proceeding is a substantive determination of the applicant’s Sixth Amendment right to counsel. These considerations alone suffice to establish a common law presumption of access to the eligibility forms. Because CJA financial affidavits do not fall within the narrow category of judicial documents whose disclosure would frustrate the corresponding criminal judicial process, a First Amendment right of access attaches to these documents as well.
Under well-established precedent, a defendant’s privacy interests alone cannot preclude the attachment of a public right of access to judicial documents in the first instance. In the absence of this right of access, judges have nearly unlimited discretion to shield CJA form 23 affidavits from public disclosure. Judges exercising this discretion will rarely, if ever, reject an applicant’s privacy interest in personal financial information to vindicate a public interest unbacked by the common law or the First Amendment.
I do not minimize the importance of the CJA applicants’ privacy interests in this financial information. These interests deserve careful consideration in the context of a constitutional balancing analysis. There was no such analysis here. Therefore, I respectfully disagree with the majority’s decision to affirm. Instead, I would remand this case to the district court with instructions to conduct the proper balancing analysis.
*207 [[Image here]]

. This is a more exacting standard than the test employed in other jurisdictions. The Third Circuit, for example, has held that "it [is] the act of filing vel non that trigger[s] the presumption of access.” Leucadia, Inc. v. Applied Extrusion Techs., Inc., 998 F.2d 157, 161-62 (3d Cir.1993) (listing cases in which "other courts have also recognized the principle that the filing of a document gives rise to a presumptive right of public access.”). Indeed, we have previously ruled that “relevant documents which are submitted to, and accepted by, a court of competent jurisdiction in the course of adjudicatory proceedings, become documents to which the presumption of public access applies.” Standard Financial, 830 F.2d at 409. Under these criteria, documents such as search-warrant affidavits and presentence reports are classified as judicial documents to which a qualified common law right of access attaches. See In re Baltimore Sun Co., 886 F.2d 60, 65 (4th Cir.1989) (search warrant affidavits); United States v. Corbitt, 879 F.2d 224, 237 (7th Cir.1989) (pre-sentence reports).

. The substance of 18 U.S.C. § 3006A(d)(4) underscores why Gonzalez is poor authority for the magistrate judge’s assertion that the CJA preempts the application of common law principles to the Form 23 affidavits. Not only does Gonzales cite no authority for the proposition that Congress intended the CJA statute and regulations to "occupy [the] field and ... supercede the common law right [of public access],” Gonzales, 150 F.3d at 1263, but the court in Gonzales was adjudicating a local newspaper’s petition to unseal CJA payment vouchers and reimbursement documentation, materials whose disclosure is discussed specifically and at great length in 18 U.S.C. 3006A(d)(4). Congress’s extended treatment of these materials reflects the unique dangers attending the premature disclosure of this information, which could potentially "reveal the strengths and weaknesses of a defendant's case and his or her trial strategy, including possible defenses, witnesses, and evidence to be used at trial.” Id. at 1259.

. Indeed, at least one court has found that "[t]he CJA does not mandate nor seemingly contemplate a closed presentation of financial information. Ex parte proceedings are not consistent with traditional adversarial proceedings.” Coniam, 574 F.Supp. at 617 n. 2.

. While the Sixth Amendment grants criminal defendants “the right to a speedy and public trial,” this amendment is not the source of the constitutional right of public access to Connolly’s financial affidavits urged by the Boston Herald. In Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), the Supreme Court established that the public's right of access to criminal proceedings is rooted in the First Amendment:
In guaranteeing freedoms such as tiróse of speech and press, the First Amendment can be read as protecting the right of everyone to attend trials so as to give meaning to those explicit guarantees .. . [T]he First Amendment guarantees of speech and press, standing alone, prohibit government from summarily closing courtroom doors which had long been open to the public at the time that Amendment was adopted.
Id. at 575-76, 100 S.Ct. 2814. For this reason, criminal defendants cannot foreclose public access to their trials and the documents submitted therein simply by waiving their Sixth Amendment right to a public trial: "While the Sixth Amendment guarantees to a defendant in a criminal case the right to a public tritil, it does not guarantee the right to compel a private trial.” Gannett Co. v. DePasquale, 443 U.S. 368, 382, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979).

. In Suarez, the intervenors only petitioned for access to attorney payment information, and did not seek to unseal the defendant’s financial affidavits. Nonetheless, the Second Circuit's observation that the oft-recognized benefits from public monitoring of criminal trials are also realized in the CJA context has important implications for this case as well.

. The majority argues that this reality unfairly imposes a "Hobson’s choice” on indigent criminal defendants, and cites our decision in Holden v. United States, 393 F.2d 276 (1st Cir. 1968) for the proposition that "defendants are not to be avoidably discriminated against because of their indigency.” Id. at 278. The "avoidable discrimination” we confronted in Holden implicated the right of the defendant to mount an effective defense unburdened by the disclosure of information that financially self-sufficient defendants would not be required to submit. We ruled that Holden was entitled to exclude the government from the required ex parte proceeding for indigent defendants seeking a subpoena under Federal Rule of Criminal Procedure 17(b). Id. The language of the CJA reflects Congress’s sensitivity to this same principle of protecting the indigent defendant from disclosures that would compromise the ability to mount an effective defense. See 18 U.S.C. § 3006A(d)(4) (directing courts to delay or limit the disclosure of payment information to avoid undermining the defendant's trial strategy); 18 U.S.C. § 3006A(e) (granting defendants an ex parte forum to request reimbursement for supplemental services). Beyond these specific areas, the broad presumption of disclosure articulated in the A.O. Guide indicates that, in the face of a substantial public interest in the CJA appointment process, indigent defendants using court appointed counsel will be subject to disclosure requirements relating to their program eligibility and the compensation of their attorneys that do not apply to defendants with privately retained counsel.

. Thus far, this category is limited to grand jury proceedings, see Press Enterprise II, 478 U.S. at 9, 106 S.Ct. 2735, jury deliberations, see Times Mirror, 873 F.2d at 1213, internal court communications, see id.., and presen-tence reports, see Corbitt, 879 F.2d at 224.

. The majority states that "[cjonstitutionaliz-ing the access question ... displaces the policy established by Congress and the courts,” and has the effect of "renderfing] the entire discretion-based framework in the A.O. Guide unconstitutional.” To the contrary, recognizing a qualified First Amendment right of access constrains, within the CJA framework, the discretion of judges who are asked to seal documents. The caselaw is replete with instances in which courts have required that a statute be applied in a manner that will avoid a First Amendment conflict. See, e.g., United States v. Three Juveniles, 61 F.3d 86 (1st Cir. 1995) (adopting a narrowing construction of the Federal Juvenile Delinquency Act); McDonnell Douglas, Pulitzer Publishing Co., 855 F.2d 569 (8th Cir.1988) (construing the Federal Wiretapping Statute as requiring judges to conduct a First Amendment balancing exercise to determine whether intercepted conversations included in court documents should be publicly disclosed).